IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| **KHALIL WRIGHT** | : | NO. 23-336 |
| | : | |

## MEMORANDUM

**J. Perez**                                                                                        **November 27, 2023**

On August 1, 2023, Defendant Khalil Wright was charged by indictment with unlawful possession of a firearm as a previously convicted felon. Wright has moved to dismiss the one-count indictment brought under 18 U.S.C. § 922(g)(1), arguing that the statute is unconstitutional on its face and as applied to him individually. For the reasons set forth below, this Court will deny Defendant's motion.

**I.**      **FACTUAL BACKGROUND**

The Government alleges that on June 10, 2023, Khalil Wright fled from Philadelphia police in a stolen vehicle that he struck an officer with following an attempted car stop. Wright subsequently crashed the car and fled on foot, leaving behind a stolen semi-automatic pistol, loaded with 16 live rounds, in the driver's seat of the stolen car. ECF No. 17 at 1-3. At the time of his arrest for the present charge, Wright was on probation for two separate felony convictions. On August 1, 2023, Wright was charged by federal indictment with one count of possession of a firearm by a person previously convicted of a crime punishable by more than one year of imprisonment, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1.

Wright's status as a person prohibited from possessing a firearm is predicated on five prior Pennsylvania convictions. Wright's record includes prior convictions for unlawfully possessing guns and drug trafficking. Beginning in 2018, Wright was convicted of carrying a firearm without a license, in violation of 18 Pa. Cons. Stat. § 6106(a)(2), a first- degree misdemeanor crime. ECF No. 17 at 4. In 2019, he was again convicted of carrying a firearm without a license, this time graded as a third-degree felony in violation of 18 Pa. Cons. Stat. § 6106(a)(1), as well as the unlawful carrying of a gun on the public streets in Philadelphia, in violation of 18 Pa. Cons. Stat. § 6108, a first-degree misdemeanor. *Id.* Just a year later, in 2020, Wright was convicted of possessing crack-cocaine with the intent to deliver, in violation of 35 Pa. Cons. Stat. § 780-113(a)(30), an ungraded felony, and of carrying a firearm without a license, in violation of 18 Pa. Cons. Stat. § 6106(a)(1), a third-degree felony. *Id.*

## II.     CONTENTIONS OF THE PARTIES

Defendant Khalil Wright has moved to dismiss the sole count in the indictment charging him with unlawfully possessing a firearm as a convicted offender. He argues that 18 U.S.C. § 922(g)(1), which prohibits people with convictions punishable by more than one year of imprisonment from possessing guns, is unconstitutional under the Second Amendment, both on its face and as applied to him individually. Defendant moves for dismissal following the United States Supreme Court ruling in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and the Third Circuit's recent en banc decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).

Using the two-step framework for as-applied challenges articulated in *Range*, Defendant asserts that: (1) the plain text of the Second Amendment presumptively protects him as a member of "the people" and (2) the Government cannot demonstrate that the application of

§ 922(g)(1) to Wright is "consistent with this nation's historical tradition of firearm regulation." ECF 16 at 5-6. Wright further argues that even if this Court were to reject his as-applied challenge, § 922(g)(1) is facially unconstitutional because: (1) there is no "founding era history" of felon disarmament; (2) the statute is unconstitutionally vague; and (3) the statute is inconsistent with the original public meaning of the Commerce Clause. *Id.* at 7-9. Wright concedes that his third argument is foreclosed by precedent, and thus this Court will not address it further.

The Government responds that the indictment should not be dismissed, since § 922(g)(1) is constitutional as applied to Defendant Wright. ECF Doc. 17. The Government argues that Wright's conduct falls beyond the protection of the Second Amendment because: (1) he did not possess the firearm for any lawful purpose; and (2) he was on probation at the time of the offense. *Id.* The Government goes on to argue that even if Defendant Wright and his conduct is in the purview of the Second Amendment, § 922(g)(1) survives the *Bruen/Range* historical inquiry because felon firearm dispossession is analogous to historical regulations aimed at disarming dangerous or otherwise non-law abiding groups of people.

### III. STANDARD OF REVIEW

Under Federal Rule of Criminal Procedure 12(b)(1), a party may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R Crim. P. 12(b)(1). In cases involving an as-applied challenge to a criminal indictment, the Court must determine whether a law with some permissible uses "is nonetheless unconstitutional as applied" to the movant's specific conduct. *Spence v. Washington*, 418 U.S. 405, 414 (1974). Conversely, successful facial challenges require that a law be struck down in its entirety because it "could never be applied in a valid manner," *Members of City Council of City of L.A. v.*

*Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). The high burden for facial invalidation requires the challenger to establish that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### IV.     LEGAL FRAMEWORK FOR SECOND AMENDMENT CHALLENGES

The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Supreme Court determined "that the Second Amendment conferred an individual right to keep and bear arms" unconnected to militia service. *Id.* at 595. However, the Court emphasized that "the right was not unlimited, just as the First Amendment's right of free speech was not" and, therefore, it did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Id.*

The Supreme Court has repeatedly stated that its Second Amendment jurisprudence does not disturb presumptively lawful gun regulations like felon disarmament. *Heller*, which announced the right to keep firearms in the home for self-defense, made clear that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." 554 U.S. 570, 626 (2008). *McDonald v. City of Chicago, Illinois* reiterated that, like all constitutional rights, the right to bear arms is not unlimited:

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places

such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.

561 U.S. 742 at 786 (2010) (quoting *Heller*, 554 U.S. 570 at 626-27 (internal citations omitted)).

*New York State Rifle & Pistol Association, Inc. v. Bruen* set forth a history-based framework for determining whether a firearm regulation is constitutional under the Second Amendment. 142 S. Ct. at 2127. Rejecting the use of means-end scrutiny in gun regulation cases[1], *Bruen* introduced a two-prong test for courts to apply. The first prong asks whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. The second prong requires the government to affirmatively demonstrate that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126-2127.

As to the second prong, the Second Amendment "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. *Id.* at 2133. Thus, when confronted with regulations "that were unimaginable at the founding," courts must reason "by analogy," which "requires a determination of whether the two regulations are relevantly similar" using "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. The Court explained that the question is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

In *Range v. Attorney General*, the Third Circuit considered an as-applied challenge to 18 U.S.C. § 922(g)(1) seeking a declaratory judgment that the felon-in-possession statute was unconstitutional as applied to him and requesting injunctive relief. 69 F.4th 96 (3d Cir. 2023)

---

[1] Prior to *Bruen,* appellate courts, including the Third Circuit, largely agreed on a two-part analysis of firearm regulations, evaluating whether the challenged regulation fell under the historical scope of gun rights, and if it did, subjecting it to means-end scrutiny. *See, e.g. United States v. Marzzarella,* 614 F.3d 85, 89, 96-97 (3d Cir. 2010).

(en banc). In a "narrow" decision, the Court held that the application of the statute to Range, whose only criminal conviction was for welfare fraud decades prior, violated his rights under the Second Amendment. *Id.* at 106, 98.

In 1995, Bryan Range pled guilty to one misdemeanor count of making false statements to obtain food stamp assistance in violation of 62 Pa. Stat. Ann. § 481(a). *Id.* at 98. He was sentenced to three years of probation, which he completed without any violations of his supervision. In the decades since this conviction, Range's only other infractions were for minor traffic tickets and a summary offense for fishing without a license. *Id.* Because Range's food stamp conviction carried a possible penalty of up to five years in prison, he is classified under federal law as a person prohibited from possessing a gun. 18 U.S.C. 922(g)(1). Unlike the Defendant in the present case, Range was never actually charged with a criminal violation of the statute. Instead, he brought a civil suit after being twice rejected from purchasing a firearm by Pennsylvania's instant background check.

Applying *Bruen* to Range's ineligibility to possess a firearm pursuant to § 922(g)(1), the Third Circuit first assessed whether the "Second Amendment applies to a person and his proposed conduct," finding that the conclusion will almost always be yes, even when a challenger has a lengthy criminal record. *Range* at 101-103. Relying on *Heller,* the majority held that Range was indeed one of "the people" as the constitutional text refers to all Americans and not only law-abiding persons. *Id.* at 101. The Third Circuit agreed with a statement of then-Judge Barrett that "all people have the right to keep and bear arms," though the legislature may constitutionally "strip certain groups of that right." *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).

Having determined that the Second Amendment applied to Range and his proposed conduct, the Court next turned to whether § 922(g)(1)'s permanent disarmament, as applied to Range, was "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 103 (citing *Bruen,* 142, S. Ct. at 2130). The government bears the burden of proof to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 101 (citing *Bruen* at 2127). To satisfy this burden, the government must point to "historical analogues" establishing that founding-era governments disarmed people sufficiently similar to the individual contesting the regulation. *Id.* The Third Circuit found that Range and "his individual circumstances" did not justify stripping him of his right to bear arms because the government failed to meet its burden of establishing that disarming people "like Range" fits within our Nation's history of disarming those who pose a threat to the orderly functioning of society. *Range*, 69 F.4th at 105.

V. **§ 922(g)(1) IS CONSTITUTIONAL AS APPLIED TO KHALIL WRIGHT**

The Court now turns to the question of whether 18 U.S.C. § 922(g)(1) withstands an as-applied challenge by someone who has been convicted of felony drug distribution and prior firearm violations. Defendant Khalil Wright was charged by indictment with violating 18 U.S.C. § 922(g)(1), which prohibits any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

1. *Whether the Text of the Second Amendment Applies to Mr. Wright and His Conduct*

This Court begins with the threshold question of whether the text of the Second Amendment applies to the Defendant and his conduct. Under *Range* and as agreed on by the

parties in this case, Mr. Wright is considered one of "the people" afforded Second Amendment protection. ECF No. 17 at 9. The Government argues, however, that Mr. Wright's *conduct* is not protected under the Second Amendment because he did not possess a firearm for any lawful purpose, and he was "permissibly barred" from possessing a gun because he was on probation.

Urging that "the core purpose of the Second Amendment is to protect the right to maintain arms to use in self-defense", the Government emphasizes the facts underlying the instant offense: "the stolen firearm at issue was recovered in a stolen vehicle, that was also bearing stolen license plate from a different vehicle. The recovery occurred after the defendant struck a police cruiser, which then hit a police officer, and took officers on a high speed car chase throughout North Philadelphia before crashing into an occupied vehicle." *Id.* at 11.[2] The Government further contends that the Second Amendment does not protect someone like Mr. Wright, who was serving a criminal sentence at the time of his arrest and the terms of his supervision/sentence restricted him from possessing a firearm.

This Court need not determine whether the Second Amendment covers Mr. Wright's conduct because the Government has met its burden to show that § 922(g)(1), as applied to Mr. Wright, is consistent with the historical tradition delineating the outer bounds of the right to keep and bear arms.

2. *Whether 18 U.S.C. § 922(g)(1), as Applied to Mr. Brown, is Consistent with the Nation's Historical Tradition of Firearm Regulation*

The Government carries the burden to affirmatively show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2132. The "central considerations" in deciding whether a modern regulation is "relevantly similar" to a

---

[2] However, for reasons unknown to this Court, the Government has not charged Mr. Wright with possessing a stolen firearm or stolen vehicle. The indictment in this case charges him solely with being a felon-in-possession of a firearm.

historical analogue are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132–33; see also *Range*, 69 F.4th at 103. This Court is satisfied that, in contrast to *Range*, the Government here has met its burden to show that prohibiting someone with prior recent drug trafficking and gun convictions is consistent with America's historical tradition of firearm regulation.

As the Supreme Court noted in *Bruen*, if individuals were "reasonably accused of intending to injure another or breach the peace," they could be subject to firearm restrictions that did not apply to others. *Bruen*, 142 S. Ct. at 2148–49. Prior to and following ratification of the Second Amendment, gun regulations disarmed people who "posed a potential danger." *Range*, 69 F.4th 96 at 109–10 (Porter, J., concurrence). Importantly, the *Range* majority did not reject the historical record presented by the government, it merely found the record inapplicable to somebody like Range, whose disarmament was based on one decades old, non-violent conviction.

Moreover, the Supreme Court made clear that in cases where there is no direct historical analogue, "the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. The Government cannot point to a historical precursor that exactly mirrors 922(g), but the felon-disarmament statute is sufficiently analogous to pass constitutional muster. When analyzing gun regulations that were "unimaginable at the founding," courts must analogize by following "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. The government argues: "[t]here is clear historical support for restricting the possession of firearms by persons who, like the defendant, previously committed dangerous felonies." ECF 17 at 15.

Citing to historical analogues from the 17th, 18th, and 19th centuries establishing that the nation has regularly restricted firearm access to those thought to be dangerous, the Government has carried its burden in this case. *Id.* at 16-19.[3] In the mid-19th century, many States enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148.[4] As the Supreme Court noted in *Bruen*, if individuals were "reasonably accused of intending to injure another or breach the peace," the government can impose restrictions on them that others would not be subject to. *Bruen*, 142 S. Ct. at 2148–49.

3. *Range is Distinguishable*

Mr. Wright's criminal history differs substantially from Range, whose only predicate conviction stemmed from an inaccurate accounting of household income on a food stamp application over 25 years ago. Mr. Wright's record is more robust, more recent, and unquestionably more concerning. Unlike Mr. Range's non-violent fraud offense, Mr. Wright's prior convictions fall within the sweep of appropriate historical gun regulation analogues.

As laid out above, Mr. Wright has been convicted three separate times of illegally possessing a firearm, most recently in connection with a felony drug trafficking offense. As instructed by this Court, the Government filed a supplemental brief following oral argument on the motion to dismiss which details the underlying facts Mr. Wright was found guilty of in connection with his various convictions. *See* ECF 23. His 2018 conviction for carrying a firearm without a license stemmed from a frisk of Mr. Wright following a report of drug dealing in an apartment building where he was trespassing. He was sentenced to three years of probation. *Id.* at

---

[3] The government cites to: Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), reprinted in 9 William Waller Hening, The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619, at 281-83 (1821); Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90; Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11-12; Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15.
[4] see, e.g., Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 162 (1846).

2. The following year, Mr. Wright violated the terms of his probation after pleading guilty yet again to illegally possessing a firearm. In that instance, police obtained a search warrant for the home of another person prohibited from possessing firearms who had been posting images of himself and others brandishing firearms on social media. Mr. Wright was present in the house at the time the warrant was executed, and police recovered a loaded firearm from his person. *Id.* at 3. In January 2020, Mr. Wright pled guilty to distributing crack-cocaine and again carrying a firearm without a license. In that case, police had conducted a series of controlled narcotics purchases through the use of a confidential informant. On May 21, 2022, Mr. Wright was sentenced to 11.5-23 months of incarceration plus two years probation. *Id.* at 4-5.

While serving that sentence in the community on state-supervised probation, Mr. Wright was again arrested on June 10, 2023 for the instant offense. The Government alleges that on the date of Defendant's arrest, Philadelphia police were observing a funeral for a gang-member who had been murdered in Southwest Philadelphia. ECF No. 17 at 2. Concerned with potential retaliatory action and gun violence at the funeral, police surveilled the area and encountered Mr. Wright in a stolen vehicle. When police attempted a car stop, Mr. Wright reversed the car into an unmarked police cruiser and fled, subsequently crashing into another car and building. He continued to flee from police on foot while officers located a loaded firearm in the vehicle that had been reported stolen. *Id.* at 2-3.

At 25 years old, Mr. Wright's record shows a pattern of escalating serious criminal activity. The present indictment represents the fourth time law enforcement has recovered an illegally possessed gun from him. When he was convicted in 2019, he was still on probation for his previous gun crime and remained on supervision when he was arrested in the case before this Court. Mr. Wright asks this Court to hold that even people like him, who have habitually flouted

gun regulation laws and been convicted of drug trafficking in connected with unlawful firearm possession, maintain an inviolate right to bear arms.

Range was a narrow decision that does not upset the long-standing prohibition of drug traffickers and other dangerous, non-law-abiding people from possessing firearms. Though the Government's presentation of historical analogues was not enough to justify the restriction of Mr. Range's Second Amendment rights, there is strong historical support for the disarmament of people who pose a danger to society. If we use the early American laws cited by the Government as rough historical analogues, the question of "how and why the regulations burden a law-abiding citizen's right to armed self-defense" leads to the conclusion that these laws are relevantly similar to a law that prohibits drug traffickers or habitual unlawful gun possessors from possessing firearms in the future. *Bruen*, 142 S. Ct. at 2132-33. While the founding generation could hardly have imagined the intolerable levels of gun violence our nation is presently facing, they too determined that disarmament of certain individuals was the way to prevent violence – albeit often in the context of disarming racial minorities and other groups seen as subversive by lawmakers at the time.

Holding § 922(g)(1) unconstitutional as applied to felony drug traffickers would effectively strip Congress of the ability to protect the public from a known danger. As the Supreme Court has recognized, "drugs and guns are a dangerous combination," *Smith v. United States*, 508 U.S. 223, 240 (1993). Our modern-day lawmakers recognize that drug traffickers are dangerous and disruptive to society, such that they should be permanently barred from possessing firearms. *See also United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023) (noting "the increased danger of violence when drug traffickers possess weapons" (quoting *U.S. Sentencing Guidelines Manual* § 2D1.1(b)(1) cmt. n. 11(A))); *United States v. Goins*, No.

522CR00091GFVTMAS1, 2022 WL 17836677, at *13 (E.D. Ky. Dec. 21, 2022) ("Serious drug offenses, like distribution or possession with intent to distribute, are inherently violent offenses that justify disarming those who commit them") (citing *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011)).

### VI.    § 922(G)(1) IS FACIALLY CONSTITUTIONAL

The Court next turns to Defendant's contention that 18 U.S.C. § 922(g)(1) is facially unconstitutional because the statute is unconstitutionally vague and violates the Commerce Clause.[5] Each of these arguments is without merit. A criminal statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). To be constitutional, "criminal statutes need only give 'fair warning' that certain conduct is prohibited." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992).

Mr. Wright cannot show that § 922(g)(1) is unconstitutional as applied to his case, let alone in all circumstances. The felon disarmament statue is clear on its face. It provides explicit notice prohibiting the possession of a firearm by any person who has previously been convicted of a crime punishable by more than a year in prison (or of certain misdemeanors as specifically defined). The text of the statute gives unambiguous notice to all people who fall within this category. However, the fact that "the Second Amendment might then constitutionally preclude punishment in certain instances should not lead us to conclude otherwise." *United States of*

---

[5] As previously noted, this Court need not address the Commerce Clause argument, which is foreclosed by precedent and the Government only presents as a means to preserve the issue on appeal.

*America v. Kalief Ladson*, 2023 WL 6810095, at *5 (E.D. Pa. Oct. 16, 2023).[6] In *Range*, the appellant raised only an "as-applied" challenge to Section 922(g)(1), and the Third Circuit had no occasion to consider whether the statute is facially unconstitutional. *Range*, 69 F.4th at 100.

### VII. CONCLUSION

The Supreme Court has regularly made clear that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. The government needs to be able to respond to the intolerably high incidence of gun violence our nation is facing—an issue the founding generation simply did not have to deal with. Mr. Wright, who has repeatedly been convicted of violating gun laws and who has a felony drug trafficking conviction in connection with his possession of an illegal gun, is decidedly not like the appellant in *Range*. Unlike the facts presented in *Range*, the historical record supports the disarmament of Mr. Wright and people with convictions like his. For the foregoing reasons, the Court concludes that the indictment, and the prohibition of drug traffickers and other dangerous felons from possessing firearms, does not violate Mr. Wright's Second Amendment rights. Accordingly, Mr. Wright's motion to dismiss the indictment will be denied. An appropriate Order to follow.

---

[6] *See also United States v. Ames*, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023); *States v. Johnson*, 2023 WL 6321767, at *3 (E.D. Pa. Sept. 27, 2023); *United States v. Blackshear,* 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023); *United States v. Green*, 2023 WL 6164407, at *2 (E.D. Pa. Sept. 21, 2023).